J-S53011-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KENNETH COLEMAN, | |
| Appellant | No. 2263 EDA 2016 |

Appeal from the PCRA Order Entered June 21, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-1201021-2004

BEFORE:  BENDER, P.J.E., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED OCTOBER 11, 2017**

Appellant, Kenneth Coleman, appeals *pro se* from the post-conviction court's June 21, 2016 order denying his timely-filed petition under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.   After careful review, we affirm.

Appellant's case returns to this Court after we vacated the PCRA court's initial denial of Appellant's at-issue petition, and remanded for further proceedings.   In that first disposition, we offered a brief summary of the facts and procedural history of Appellant's case, as follows:

> Appellant was accused of stabbing two individuals, Loraine Patterson (Patterson) and Joseph Leary (Leary), during a fight in Victor's Tavern in Philadelphia on the evening of November 5, 2004.  The case proceeded to a jury trial, during which Appellant testified that he acted in self-defense, out of fear that Leary was going to hurt him.  Appellant was found guilty of felony-two aggravated assault with respect to Patterson, felony-one attempted murder and felony-one aggravated assault with

respect to Leary, and possessing an instrument of crime. He was sentenced on October 7, 2005, to an aggregate of 17 1/2 to 35 years' incarceration.

On March 9, 2009, a panel of this Court affirmed Appellant's judgment of sentence, but remanded to correct a conviction that should have merged for sentencing. **See Commonwealth v. Coleman**, 972 A.2d 549 (Pa. Super. 2009) (unpublished memorandum), *appeal denied* 908 A.2d 605 (Pa. 2009). Appellant's sentence was corrected by the trial court on May 6, 2010, although his aggregate term of incarceration remained the same.

On July 29, 2010, Appellant timely filed a *pro se* PCRA petition in which he claimed that "trial/appellate counsel [failed] to raise a claim of prosecutorial misconduct [under **Brady**[2]] on direct appeal for withholding exculpatory evidence (a surveillance tape) prior to and during trial (resulting in a discovery violation)." He also listed an eyewitness, Mary Boone, who [*sic*] he claimed should have been called to testify and bolster his claims of self-defense.

[2] **Brady v. Maryland**, 373 U.S. 83 (1963).

On June 29, 2011, following a **Grazier**[3] hearing, Appellant was granted permission to proceed *pro se*, and John Cotter, Esquire was appointed as stand-by counsel.

[3] **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

Appellant filed multiple motions, most of which centered around his claim that trial and appellate counsel failed to raise a claim of prosecutorial misconduct based on his contention that the Commonwealth suppressed video/audio surveillance footage of Victor's Tavern in violation of **Brady**. To those motions, Appellant attached a Philadelphia Police Department Complaint or Incident Report[, completed by Officer Seth Stellfox and] issued following the incident in question, which contains the note "surveillance tape recovered." He also included a letter by his trial (and appellate) counsel Douglas N. Stern, Esquire, dated November 1, 2005, informing Appellant that his direct appeal was filed and stating[,] "I am also trying to see if I can obtain a copy of the videotape if one exists."

On April 2, 2013, the PCRA court sent Appellant notice pursuant to Pa.R.Crim.P. 907, informing him that it determined that his

PCRA issues were without merit. On May 31, 2013, Appellant's PCRA Petition was dismissed by the PCRA court. Appellant filed a timely notice of appeal on June 10, 2013.

*Commonwealth v. Coleman*, No. 1791 EDA 2013, unpublished memorandum at 1-3 (Pa. Super. filed April 8, 2014) (one footnote omitted) (hereinafter, "*Coleman I*").

On appeal in *Coleman I*, Appellant contended, *inter alia*, that the PCRA court had erred by denying his petition without a hearing. The *Coleman I* panel agreed, concluding that Appellant had demonstrated that genuine issues of material fact existed regarding both of his ineffectiveness claims. For instance, pertaining to Appellant's ineffectiveness claim involving the video surveillance tape, the *Coleman I* panel found that "[t]he existence and availability of the videotape … is dispositive[,]" and that Appellant had presented "evidence to support [his] claim that the videotape exists, as demonstrated by the notation contained in the criminal complaint paperwork filed on the night of the incident." *Id.* at 5. While "the district attorney informed the PCRA court that he had investigated the matter[,]" and no tape had been produced by the Commonwealth, the *Coleman I* panel concluded that Appellant was entitled to an "opportunity to litigate fully this issue at a hearing." *Id.*

Likewise, the *Coleman I* panel also decided that a hearing was required on Appellant's claim that Attorney Stern ineffectively failed to call Mary Boone to the stand at trial. The panel noted that Appellant had attached to his petition an affidavit from Boone, which demonstrated that

her "testimony is material to Appellant's defense and, if believed, could have had a substantial impact on the verdict." *Id.* at 6. For these reasons, the *Coleman I* panel remanded for an evidentiary hearing on both of Appellant's ineffectiveness claims, and it also suggested that a new judge be appointed, in light of Appellant's argument on appeal that the PCRA court should have recused itself. *Id.* at 8.

On remand, Appellant continued to represent himself, with Attorney Cotter as standby counsel. *See* PCRA Court Opinion (PCO), 6/21/16, at 2 n.1. A new judge was appointed to preside over the PCRA hearing, and that bifurcated proceeding took place on December 15, 2014, April 9, 2015, and October 13, 2015. The court also accepted an amended petition filed by Appellant on August 6, 2015. After the hearing concluded, the case was continued for submission of briefs. On November 5, 2015, Appellant filed his *pro se* brief, and on December 4, 2015, the Commonwealth filed its response. On December 14, 2015, the Commonwealth also filed a motion to dismiss Appellant's petition. On June 21, 2016, the PCRA court issued an order denying Appellant's petition, accompanied by an opinion entitled, "Findings of Fact and Conclusions of Law."

Appellant filed a timely, *pro se* notice of appeal. It does not appear that the PCRA court directed Appellant to file a Pa.R.A.P. 1925(b) statement, and the court relied on its "Findings of Fact and Conclusions of Law" in lieu of a Rule 1925(a) opinion. Herein, Appellant presents two issues for our review:

[I.] []Whether the PCRA court committed an abuse of discretion, by misapplying or overriding the law, when it found that[] Appellant was not prejudiced by counsel's ineffectiveness, (acts and omissions), as they relate to the Commonwealth's failure to disclose a []surveillance tape[] recovered from the scene, which violated Appellant's rights to a fair trial and[] Appellant's rights to procedural and substantive due process?[]

[II.] []Whether the PCRA court committed an abuse of discretion by[] misapplying or[] overriding the law, when it held that[] counsel was not ineffective for failing to[] investigate, and present, the []eyewitness[] testimony of []Mary Boone[], who was available and willing to testify on Appellant's behalf had she been contacted, and in doing so, violated Appellant's rights to a fair trial[] under the Sixth Amendment?[]

Appellant's Brief at 7 (unnecessary capitalization omitted).

We begin by recognizing that "[t]his Court's standard of review from the grant or denial of post-conviction relief is limited to examining whether the lower court's determination is supported by the evidence of record and whether it is free of legal error." **Commonwealth v. Morales**, 701 A.2d 516, 520 (Pa. 1997) (citing **Commonwealth v. Travaglia**, 661 A.2d 352, 356 n.4 (Pa. 1995)). Where, as here, a petitioner claims that he received ineffective assistance of counsel, our Supreme Court has directed that the following standards apply:

[A] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). "Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." [**Commonwealth v.**] **Colavita**, 606 Pa. [1,] 21, 993 A.2d [874,] 886 [(Pa. 2010)] (citing

- 5 -

***Strickland*[ *v. Washington***, 104 S.Ct. 2053 (1984)]). In Pennsylvania, we have refined the ***Strickland*** performance and prejudice test into a three-part inquiry. ***See*** [***Commonwealth v.*] *Pierce***, [515 Pa. 153, 527 A.2d 973 (Pa. 1987)]. Thus, to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result. ***Commonwealth v. Ali***, 608 Pa. 71, 86, 10 A.3d 282, 291 (2010). "If a petitioner fails to prove any of these prongs, his claim fails." ***Commonwealth v. Simpson***, [620] Pa. [60, 73], 66 A.3d 253, 260 (2013) (citation omitted). Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. ***See Ali, supra***. Where matters of strategy and tactics are concerned, "[a] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." ***Colavita***, 606 Pa. at 21, 993 A.2d at 887 (quotation and quotation marks omitted). To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." ***Commonwealth v. King***, 618 Pa. 405, 57 A.3d 607, 613 (2012) (quotation, quotation marks, and citation omitted). "'[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.'" ***Ali***, 608 Pa. at 86–87, 10 A.3d at 291 (quoting ***Commonwealth v. Collins***, 598 Pa. 397, 957 A.2d 237, 244 (2008) (citing ***Strickland***, 466 U.S. at 694, 104 S.Ct. 2052)).

***Commonwealth v. Spotz***, 84 A.3d 294, 311-12 (Pa. 2014).

Within Appellant's first issue, he presents three distinct claims of ineffectiveness, all involving his trial counsel's handling of missing videotape surveillance footage from Victor's Tavern on the night of the stabbing. In regard to the missing video, the PCRA court made the following findings of fact, based on the testimony and evidence presented at the PCRA hearing:

34. Assistant District Attorney Mark Levenberg was the trial prosecutor of [Appellant] in 2005, at which time he had been a Philadelphia Assistant District Attorney for approximately five years. N.T. 12/15/14, p. 24.

35. [ADA] Levenberg was responsible for gathering and presenting the available evidence. [*Id.* at] 25.

36. [ADA] Levenberg testified that he reviewed his file, which included a 48[6] that mentions a videotape, but there was no videotape. [*Id.* at] 24, 42.

> [6] "48" is shorthand for Philadelphia Police Department for[m] 75-48, also knowing as a Complaint/Incident [Report]. N.T. 7/5/05, pp. 11-12.

37. The 48 appears in the record as Exhibit A to the PCRA Petition.

38. The 48 was prepared by Officer Stellfox, who is deceased. N.T. 12/15/14, p. 22.

39. [ADA] Levenberg presented Stellfox as a Commonwealth witness at trial. N.T. 7/5/05, pp. 4-13, 15-16.

40. [ADA] Levenberg introduced the 48[] prepared by Stellfox into evidence at trial. N.T. 7/5/05, pp. 11-12.

41. The 48 states, in pertinent part, "Surveillance Tape recovered." Exhibit A to the PCRA Petition.

42. There was no other mention of a videotape in the file, and [ADA] Levenberg never had or saw a video in this case. N.T. 12/15/14, pp. 25-26, 28.

43. [ADA] Levenberg testified he had no knowledge of any video and did not recall having a conversation with the case detectives about a video. [*Id.* at] 25-27, 33.

44. [ADA] Levenberg did make inquiry [during the post-conviction proceedings] about the existence of the mentioned surveillance video.

45. [ADA] Levenberg did not have any conversation with Douglas Stern, [Appellant's] trial counsel, about the video, although the 48 was introduced at trial and Stellfox, the officer who prepared the 48, testified at trial. [*Id.* at] 28-30.

46. [Attorney] Stern … testified at the hearing before this Court. N.T. 4/9/15.

47. [Attorney] Stern was notably hostile during his testimony while being questioned by [Appellant], who is a *pro se* litigant.

48. [Attorney] Stern was exceedingly defensive during his testimony.

49. [Attorney] Stern was not entirely credible.

…

61. [Attorney] Stern never received or saw a video. N.T. 4/9/15, pp. 8-9, 27-29.

62. [Attorney] Stern did not speak to ADA Levenberg about the surveillance tape.

63. [Attorney] Stern did not make a written request of the Commonwealth for the surveillance tape.

64. [Attorney] Stern did not file a motion or otherwise seek [c]ourt assistance in obtaining the surveillance tape.

65. [Attorney] Stern did not know if there was a tape or, if there was, whether it was ever in the Commonwealth's possession or what was on it. [*Id.* at] 32-33, 35.

66. When cross-examining … Officer Stellfox, [Attorney] Stern asked if anyone took pictures of the crime scene, to which the officer responded in the negative. N.T. 7/5/05, pp. 14-15.

67. [Attorney] Stern also raised the absence of crime scene pictures in his closing [argument]. [*Id.* at] 163-164.

68. [Attorney] Stern did not question any witnesses about the missing surveillance tape at trial. N.T. 7/5/05, 7/6/05.

69. In particular, [Attorney] Stern did not ask [Joyce] Smith, the Victor's Tavern Bar Manager, or Officer Stellfox, who prepared the 48, about the surveillance tape. N.T. 7/6/05, pp. 52-60; 7/5/05, pp. 14-15.

70. [Attorney] Stern did not argue the missing surveillance video in his closing to the jury. [N.T.] 7/5/05, pp. 152-170.

71. The first time [Attorney] Stern indicated that he would seek the surveillance video was on November 1, 2005, after

[Appellant] had been convicted. N.T. 4/9/15, pp. 28-29; Exhibit B to PCRA Petition.

72. [Attorney] Stern was not aware of the missing surveillance video until after [Appellant] had been convicted.

73. Detective Terrence Anderson was interviewed by the defense on July 6, 2015.

74. After reviewing the 75-48 and 75-49[8] forms, Detective Anderson "vaguely remember[ed] the case but nothing specific" and does "not remember any video surveillance."

    [8] "75-49" is the Philadelphia Police Department form number for the Investigation Report.

75. Retired Police Officer Terrence Davis, the assigned investigator on this matter, was interviewed by the defense on August 13, 2015. Carey Investigations, Investigative Report, August 13, 2015.

76. Officer Davis reviewed the 75-48 and 75-49 forms, but does not remember the case or a videotape. Carey Investigations, Investigative Report, August 13, 2015.

77. If he had received a videotape, Officer Davis would have noted it on the 75-49 he prepared. Carey Investigations, Investigative Report, August 13, 2015.

78. Officer Stellfox recovered a surveillance video from Victor's Tavern. Exhibit A to the PCRA Petition.

79. There was no evidence adduced that the Victor's Tavern surveillance video recording system would have captured the altercation involving [Appellant], Leary and Patterson.

80. The surveillance video was not delivered to Detective Anderson or the assigned investigator, Police Officer Davis.

81. The surveillance video was never in the possession of the prosecutor.

82. There is no evidence, whether direct, testimonial or circumstantial[,] regarding the content of the surveillance video.

83. There is no evidence that the surveillance video was materially exculpatory.

84. There is no evidence that the police or the prosecution by their conduct indicated that the surveillance video could form a basis for exonerating [Appellant].

85. There is no evidence that the police or prosecution willfully lost or discarded the surveillance video.

86. There is no evidence regarding the circumstances of the disposition of the surveillance video.

PCO at 5-10.

In Appellant's first ineffectiveness claim pertaining to the video, he contends that Attorney Stern should have argued that the Commonwealth committed a *Brady* violation by not turning over to the defense the videotape that was noted in Officer Stellfox's Complaint or Incident report (*i.e.*, the '48' form). The PCRA court rejected this claim, reasoning that "[t]here is no evidence that the surveillance tape contained materially exculpatory evidence." PCO at 11.

We ascertain no error in the court's decision. Our Supreme Court has explained that,

[t]o establish a *Brady* violation, an appellant must prove three elements:

(1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued.

The burden rests with the appellant to prove, by reference to the record, that evidence was withheld or suppressed by the prosecution. The evidence at issue must have been material evidence that deprived the defendant of a fair trial. Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A

- 10 -

reasonable probability is a probability sufficient to undermine confidence in the outcome.

***Commonwealth v. Roney***, 79 A.3d 595, 607 (Pa. 2013) (internal citations and quotation marks omitted).

In this case, the PCRA concluded that Appellant failed to establish that the Commonwealth committed a ***Brady*** violation because he had not produced any evidence establishing what the videotape showed, or that it was exculpatory. The record supports this determination. We recognize that it would be difficult, if not impossible, for Appellant to present evidence of what exactly was ***on*** the tape, because Officer Stellfox is deceased and the tape is missing. Nonetheless, we agree with the PCRA court that, at the very least, Appellant could have presented evidence that a camera in Victor's Tavern was recording at the time of the incident, and that it would have captured the area of the bar in which the altercation occurred.[1] Such

_____

[1] Indeed, Appellant has demonstrated that such evidence exists. Namely, he has filed with this Court a Petition for Remand (discussed in more detail, *infra*), which includes an affidavit from Kenny He, the purported owner of Victor's Tavern. Appellant also filed that same affidavit with the PCRA court, in a "Motion to Include Newly-Discovered Evidence," on April 24, 2017, after his present appeal had been filed. In He's affidavit, dated March 30, 2017, He states that the Victor's Tavern "surveillance system was fully operational, and would have captured any, and all actions that transpired between the patrons that were involved in the altercation." ***See*** Appellant's Petition for Remand, 8/4/17, at Exhibit C. This affidavit is precisely the type of evidence that Appellant could have offered below to raise an inference that the missing videotape was exculpatory. However, Appellant did ***not*** present He's affidavit or testimony to the PCRA court during the post-conviction proceedings; instead, he only first presented this evidence ***after*** he filed a notice of appeal. Appellant offers absolutely no explanation, in either the "Petition for Remand" filed with this Court or in his "Motion to Include Newly-
*(Footnote Continued Next Page)*

evidence could have raised an inference that the video went missing because it was favorable to the defense. However, Appellant failed to present any evidence before the PCRA court to raise this inference. Accordingly, we are compelled to agree with the court that Appellant did not demonstrate that a **Brady** violation was committed by the Commonwealth. Thus, he has also failed to establish that Attorney Stern acted ineffectively for failing to raise such a claim.

Second, Appellant contends that his trial counsel acted ineffectively for not raising a **Youngblood**[2] challenge regarding the missing videotape. Our Supreme Court has explained that, in addition to exculpatory evidence that must be turned over under **Brady**,

> [t]here is another category of constitutionally guaranteed access to evidence, which involves evidence that is not materially exculpatory, but is potentially useful, that is destroyed by the state before the defense has an opportunity to examine it. When the state fails to preserve evidence that is "potentially useful," there is no federal due process violation "unless a criminal defendant can show bad faith on the part of the police." **Youngblood**, 488 U.S. at 58, 109 S.Ct. 333…. Potentially useful

*(Footnote Continued)* ————————————

Discovered Evidence," regarding why he could not have obtained He's affidavit during the PCRA proceedings. Instead, Appellant simply states that He "was questioned about the case" on March 30, 2017, and He's affidavit was then obtained. Motion to Include Newly-Discovered Evidence, 4/24/17, at 1. Appellant does not elucidate who questioned He, or why that interview could not have been conducted earlier in these PCRA proceedings. Consequently, we cannot consider this evidence, which is being presented for the first time on appeal. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

[2] **Arizona v. Youngblood**, 488 U.S. 51 (1988).

- 12 -

evidence is that of which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." [*Id.*] … at 57…. In evaluating a claim that the Commonwealth's failure to preserve evidence violated a criminal defendant's federal due process rights, a court must first determine whether the missing evidence is materially exculpatory or potentially useful.

***Commonwealth v. Chamberlain***, 30 A.3d 381, 402 (Pa. 2011) (some internal citations omitted).

Here, the PCRA court concluded that Appellant failed to demonstrate a ***Youngblood*** violation because he had not proven that the videotape was discarded or destroyed in bad faith. Again, we are compelled to agree. Officer Stellfox is deceased, so there is no way of knowing if or why he did not give the videotape to ADA Levenberg or any of the other investigating officers. Moreover, even if an inference that Officer Stellfox acted in bad faith would suffice to establish a due process violation under ***Youngblood***, Appellant has failed to present any evidence that would allow us to draw such an inference. As discussed in relation to Appellant's ***Brady*** claim, Appellant did not prove, at the PCRA hearing, that the video cameras inside the tavern actually recorded the altercation. Therefore, we simply cannot draw an inference that the videotape recovered by Officer Stellfox was favorable to the defense and, therefore, the officer lost or destroyed it in bad faith. Accordingly, we must accept the PCRA court's conclusion that Attorney Stern did not act ineffectively for failing to raise a ***Youngblood*** challenge.

Third, Appellant claims that Attorney Stern was ineffective for not seeking out the videotape after seeing the notation in Officer Stellfox's '48' form, and for not cross-examining the officer and/or Joyce Smith, the Victor's Tavern bartender, about the videotape. In rejecting this ineffectiveness claim, the PCRA court first concluded that counsel **did** act unreasonably in these regards. **See** PCO at 16-17. Nevertheless, the court found that Appellant could not demonstrate prejudice because, again, "there is no evidence that the missing video would have been exculpatory." **Id.** at 17.

Based on our discussion above, we are constrained to agree with the PCRA court that Appellant's evidence was not sufficient to prove that the videotape was exculpatory; thus, he has not demonstrated that if Attorney Stern had sought out and acquired the tape, the outcome of the trial would have been different. Additionally, if Attorney Stern had sought out the tape and discovered it was missing, he could have at best cross-examined Officer Stellfox about the missing tape to raise an inference that the tape was destroyed or lost because it was beneficial to the defense. However, we cannot conclude that raising such an inference would have created reasonable doubt and changed the jury's verdict, as the Commonwealth's eyewitness testimony against Appellant was compelling. This Court previously summarized that evidence, as follows:

> On November 5, 2004, at about 10:15 p.m., all of the parties involved were inside Victor's Tavern in Philadelphia. Leary, Patterson, and two male friends of Patterson were

- 14 -

together at a table near the bathrooms. Patterson and her two male friends [are] … gay. Appellant was sitting at a nearby table with another man and woman. Someone at Appellant's table made remarks concerning the sexual orientation of Leary's group. Leary testified that Appellant, while looking at him, said, "He must be gay, too." N.T., 7/5/05, at 42. Leary replied to Appellant, "You must be gay." *Id.* Patterson testified she heard her brother address someone at Appellant's table and say, "Yeah, so what, they gay [*sic*]. They entitled to have a good time too [*sic*]." *Id.* at 69.

…

Leary testified that Appellant returned to the bar about a half-hour after the initial verbal exchange. Shortly thereafter, he and Appellant were sitting in their respective seats looking at each other when Appellant jumped up and ran toward him. Appellant started stabbing him, inflicting wounds to Leary's head, chin and shoulder. Leary lost a lot of blood, was hospitalized for six days, and required an operation to remove a portion of a broken blade from his skull. He suffered a six-inch scar on the left side of his head, above his ear, a two-and-one-half-inch scar on the right side of his chin, and a one-and-a-half-inch scar on top of his right shoulder. He testified that the attack by Appellant was unprovoked, he never put his hands on Appellant, and did not try to grab Appellant.

Leary admitted that he was incarcerated at the time of trial for an unrelated simple assault conviction, … and he admitted to a previous conviction for aggravated assault in 1980. He also conceded he was "bigger" and heavier than Appellant. N.T., 7/5/05, at 55.

Patterson testified that she was talking to a barmaid when the barmaid, with an expression on her face, pointed behind her. Patterson turned and saw Appellant standing over Leary, who was sitting in a chair, "stabbing him all in the neck." *Id.* at 71. She ran to Appellant and knocked him off Leary by hitting him with her shoulder. They fell, and she was on top of Appellant when he reached over and stabbed her in the back, near her spine. *Id.* at 72. She was treated for the wound at the hospital and was discharged the next morning. She received five or six clamps in her back, resulting in a three-quarter inch scar. Patterson also testified that she observed Leary bleeding, and that she bled as a result of her wound. She stated, "There was

so much [blood], I kept slipping in it trying to get up." *Id.* at 73.

Joyce Smith, the manager of Victor's Tavern, testified that she was on duty that night and recognized Appellant by sight. She observed Appellant speaking to a woman, whom she had seen previously and thought was Appellant's wife. The woman left the bar, but Appellant remained. Smith was talking to some friends when she noticed Appellant "hitting" Leary, describing an overhead blow with a fist, with the bottom portion of Appellant's hand hitting Leary in the head. After the assault, Appellant ran out of the bar, passing by Smith and enabling her to see that he was holding, in the same hand with which he had been hitting Leary, a knife by the handle, with the blade facing to his rear. She described the knife blade as about six inches in length, silver, with blood on it. She stated that there was a lot of blood at the scene, and that both victims had been bleeding. A police officer testified that, upon arriving at the scene, he observed Patterson bleeding from her back, and Leary bleeding profusely from the top of his head. He observed blood on the floor where Patterson lay and blood on the table and floor where Leary was sitting.

When Appellant was apprehended the next day, Officer James Morace secured a black box-cutter with a silver screw and silver thumb level from Appellant's right jacket pocket. During his initial interaction with the police, Appellant provided a false name, date of birth, and driver's license number. Believing that Appellant matched the description of the assailant involved in the bar assault the night before, Officer Morace ascertained that the information provided to him by Appellant was false. He again asked Appellant for his name, at which time Appellant provided his real name. Subsequently, Appellant was arrested.

*Commonwealth v. Coleman*, No. 2988 EDA 2005, 2967 EDA 2005, unpublished memorandum at 2-6 (Pa. Super. filed March 9, 2009).

The testimony of Leary and Patterson was sufficient for the jury to conclude that Appellant was the initial aggressor in the assault on Leary. We recognize that Leary had a history of assaulting other individuals and was much bigger than Appellant, and Patterson had a motive to fabricate

- 16 -

because she is Leary's sister. However, their testimony was corroborated by a disinterested third-party, Joyce Smith, who testified that she saw Appellant hit Leary approximately "three or four times" around Leary's "head section." N.T. Trial, 7/6/05, at 40-41. Moreover, Appellant fled from the scene and then gave police a false name, date of birth, and driver's license number, thus indicating his consciousness of guilt. *See Commonwealth v. Hargrave*, 745 A.2d 20, 23 (Pa. Super. 2000) ("Flight does indicate consciousness of guilt, and a [fact-finder] may consider this evidence, 'along with other proof, from which guilt may be inferred.'"); *Commonwealth v. Toro*, 638 A.2d 991, 998 (Pa. Super. 1994) (stating that evidence that the defendant "use[d] different names during his contacts with police … was relevant to the issue of [his] consciousness of guilt").

In light of the evidence presented by the Commonwealth at trial, we are compelled to agree with the PCRA court that Appellant has not demonstrated that Attorney Stern's failure to cross-examine Officer Stellfox, or Joyce Smith, about the missing videotape would have changed the jury's verdict. We cannot know what Smith or Officer Stellfox would have said, had trial counsel cross-examined them about the missing videotape. If Smith had testified that she gave the tape to police, and Officer Stellfox could not explain the tape's disappearance, then Attorney Stern could have argued that the tape was lost or destroyed because it contained exculpatory evidence. However, we cannot conclude that there is a reasonable probability that raising such an inference would have outweighed the

Commonwealth's evidence that refuted Appellant's claim of self-defense by demonstrating that he was the aggressor in the altercation. Therefore, we must agree with the PCRA court that Appellant's ineffectiveness claim is meritless.

Before delving into Appellant's second issue, we will address an after-discovered evidence claim related to the missing video surveillance tape, which Appellant presented for the first time on appeal in his "Petition for Remand" filed on August 4, 2017. Therein, Appellant claims that he has discovered new evidence in the form of a July 20, 2017 news article describing some alleged, and some proven, misconduct by former Philadelphia Police Detective James Pitts. According to Appellant, "Detective Pitts was the primary [detective] on [Appellant's] case, and [Pitts] also prepared the formal charging statement, and the arrest report." Petition for Remand, 8/4/17, at 1. Appellant also asserts that after Officer Stellfox received the tape from Victor's Tavern, Pitts "would have been the next person in the chain of custody" of the videotape. *Id.* at 2. Essentially, Appellant alleges that Pitts' misconduct in numerous other cases indicates that he must have destroyed the video surveillance tape in this case, and that he did so in bad faith. Appellant asks that this Court remand for another PCRA hearing, wherein he can "expand the record by giving a full-throated argument in respect to … Pitts['] conduct in this matter as it relates directly to the disappearance and, possible destruction of[,] the surveillance tape recovered in this case…." *Id.* at 3.

We deny Appellant's remand request for several reasons. First, we assess Appellant's petition for remand under Pa.R.Crim.P. 720(C) (stating "[a] post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery"). Our review of his remand request, which is based in large part on a newspaper article, is also guided by our Supreme Court's decision in **Commonwealth v. Castro**, 93 A.3d 818 (Pa. 2014). There, the Court explained that,

> allegations in the media, whether true or false, are no more evidence than allegations in any other out-of-court situation. Nothing in these allegations even read in the broadest sense, can be described as "evidence," and references to the officer being under investigation for misconduct contains no information regarding what evidence existed to substantiate this averment. One cannot glean from these bald allegations what evidence of misconduct [Castro] intended to produce at the hearing.

**Id.** at 825. The **Castro** Court also concluded that a Rule 720 motion,

> is not to serve as a preemptive means of securing a hearing that will itself comprise the investigation. [Castro] needed to do more than present an article "pointing to" allegations that if true have the potential to aid his cause; he needed to clearly articulate in his motion what evidence he would present to meet the [after-discovered evidence] test....[3]

---

[3] The after-discovered evidence test requires a petitioner to demonstrate that:

> (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely.

*(Footnote Continued Next Page)*

- 19 -

***Id.*** at 828.

Here, Appellant has failed to articulate any evidence that he would present at a hearing if we granted his petition to remand. Under ***Castro***, the newspaper article he attaches to his petition is not 'evidence.' We recognize that, unlike in ***Castro***, Appellant has also included in his petition a lengthy 'Appendix,' which is comprised of documents that seemingly were filed in a civil lawsuit against Detective Pitts. Those documents include a request for discovery, in which the plaintiff in that civil case, Nafis Pinkney, describes at least 12 other cases in which allegations of misconduct were lodged against Pitts, some of which have allegedly been proven. Pinkney's case documents also include reports by the Internal Affairs Division of the Philadelphia Police Department, which detail allegations of misconduct against Pitts that were subsequently deemed to be 'sustained,' or, in other words proven.

Notably, all but one of the various cases alleging misconduct by Pitts involved accusations that he coerced statements from suspects or witnesses. The other case alleged that Pitts physically assaulted a suspect. Thus, none of the documents accompanying Appellant's Petition for Remand

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

***Commonwealth v. Rivera***, 939 A.2d 355, 359 (Pa. Super. 2007).

demonstrate (or even allege) that Pitts committed the sort of misconduct that Appellant alleges in the present case, *i.e.*, the destruction of evidence.

Moreover, even if the documents filed in Pinkney's civil lawsuit against Pitts would be admissible at a PCRA hearing, that evidence would not be sufficient to demonstrate that Pitts committed misconduct **in this case**. Appellant has offered absolutely no evidence that Pitts could have destroyed the video surveillance tape that was recovered by Officer Stellfox. For instance, Appellant has not established the extent of Pitts' involvement in this case, or that he even had access to the at-issue tape. Appellant's bald claim that Pitts was the 'primary' investigator in his case is not supported by anything in the record, which instead demonstrates that Philadelphia Police Officer Davis was the "assigned investigator." **See** PCO at 9. Moreover, Appellant provides no documentation or citation to support his assertion that Pitts would have been the next person in the chain of custody of the videotape.

In sum, Appellant has not identified any evidence that he would present at a hearing to demonstrate the extent of Pitts' involvement in the investigation of this case, or that Pitts had any access to the at-issue videotape. The 'evidence' of Pitts' misconduct in other cases, alone, is not evidence that he committed misconduct in this case. Indeed, even an inference of that fact is tenuous, given that the large majority of Pitts' alleged misconduct involved coercing statements, and there were no allegations (in the documents provided by Appellant) that Pitts destroyed

evidence. Therefore, for all of these reasons, we deny Appellant's petition to remand for another PCRA hearing.

We now move on to Appellant's second issue, in which he avers that Attorney Stern acted ineffectively by not contacting, or calling to the stand, a witness named Mary Boone. The PCRA court summarized the evidence presented at the PCRA hearing regarding counsel's failure to call Boone, as follows:

> 17. Mary Boone was living with [Appellant] in November of 2004. N.T. 12/15/14, p. 11.
>
> 18. On November 5, 2004, the night of the incident, Boone was working at the Rite Aid Pharmacy at Chelten and Wayne Avenues in Philadelphia, across the street from Victor's Tavern, the scene of the incident. [*Id.* at] 11.
>
> 19. On November 5, 2004, Boone came to Victor's [Tavern] from her work at Rite Aid, accompanied by a security guard, in order to get [Appellant]. [*Id.* at] 11, 12.
>
> 20. Boone joined [Appellant] at a table, but declined his offer of a drink and instead said she was tired and wanted to go home. [*Id.* at] 12.
>
> 21. [Appellant] retrieved his coat from the chair, finished his drink, and then went to the bathroom. [*Id.* at] 12-13.
>
> 22. Boone testified she saw Joseph Leary block [Appellant] as he attempted to enter the bathroom and an argument appeared to ensue, although Boone could not hear what was said. [*Id.* at] 13, 19-20.
>
> 23. Boone testified she observed that Leary's body language was very aggressive and hostile toward [Appellant]. [*Id.* at] 20.
>
> 24. Boone testified she saw Leary push and punch [Appellant], and then a fight broke out while Boone stood near the door. Boone called [Appellant's] name, however she could not reach him because of the crowd. [*Id.* at] 13-14.

25. Boone testified that as the fight was occurring between Leary and [Appellant], she saw Lorraine Patterson, Leary's sister, come from behind [Appellant], grab him and pull back on [Appellant's] arms, and it appeared to her that Patterson appeared to be trying to restrain [Appellant]. [*Id.* at] 14-15.

26. Boone's testimony, if believed by a jury, supports [Appellant's] trial testimony that he was acting in self-defense.

27. Boone does not recall ever being contacted by Douglas Stern, [Appellant's trial] counsel, whether by phone or in person. [*Id.* at] 15-16.

28. Boone was not contacted by [Attorney] Stern by mail. [*Id.* at] 15-16.

29. Boone was not present at [Appellant's] trial, and was not present when he testified in his own defense. [*Id.* at] 17.

30. Boone also was not present at trial when the barmaid (also identified as the bar manager), Joyce Smith, testified. [*Id.* at] 18.

31. Smith testified at trial that she saw Boone "walk out. She left the bar" and [Appellant] sat back down. N.T. 7/6/05, p. 32, 38.

32. Boone testified that she would have been willing to testify at trial, had she been asked to do so. N.T. 12/15/14, p. 16.

33. Boone's testimony that she witnessed any part of the incident was not credible.

…

50. [Attorney] Stern testified that he discussed potential witnesses with [Appellant] in the course of preparing the case for trial. N.T. 4/9/15, pp. 5-6, 46.

51. Although he did not recall her name, [Attorney] Stern discussed Mary Boone, who [Appellant] identified as his fiancé, as the only other witness with knowledge of the incident. N.T. 4/9/15, pp. 5-6, 46.

52. [Attorney] Stern testified that he did not call Boone because she [did not] actually witness the incident. [*Id.* at] 6.

53. [Appellant] told [Attorney] Stern that Boone [did not] actually witness the incident, but was outside before the incident took place. [*Id.* at] 6, 8, 13-14, 46.

54. [Appellant] gave [Attorney] Stern all of Boone's contact information. [*Id.* at] 10, 12.

55. [Attorney] Stern testified that he does not recall contacting Boone. [*Id.* at] 12.

56. [Attorney] Stern did not contact Boone.

57. [Appellant] testified at trial that Boone left before him and was standing outside waiting for him when the whole incident took place. [*Id.* at] 7; N.T. 7/7/05, p. 133.

58. [Appellant] testified at trial that when he came outside, Boone asked him what was that all about. N.T. 7/7/05, p. 133.

59. The location of the altercation inside Victor's [Tavern] was to the right of the entry door, at the rear/back of the bar, near the bathroom and the cigarette machine. N.T. 7/5/05, pp. 8, 9, 10, 65-66; N.T. 7/6/05, pp. 34-35, 39-40, 47, 55, 61.[7]

> [7] [Appellant] attached photographs of the inside of Victor's Tavern[,] which he claims show the premises as they appeared on November 5, 2004. However, there was no testimony to this effect from [Appellant], nor were the photographs shown to [] Boone or any other witness at the hearing. No one from Victor's [Tavern] was called to testify. Accordingly, there is no testimony that the photographs proffered by [Appellant] by affidavit are a fair and accurate representation of the way Victor's Tavern appeared at the time of the incident.

60. Based on the location of the altercation, [Appellant] would not have been in a position to see if Boone had actually exited the bar at the time of the confrontation with Leary at the rear of the bar near the bathroom.

PCO at 7-8 (some footnotes omitted).

Based on these findings of fact, the PCRA court concluded that Appellant had not demonstrated that Attorney Stern acted ineffectively

regarding Mary Boone. The court first noted that in **Commonwealth v. Chmiel**, 30 A.3d 1111, 1143 (Pa. 2011), our Supreme Court explained:

> Where a claim is made of counsel's ineffectiveness for failing to call witnesses, it is the appellant's burden to show that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice to the appellant.

**See** PCO at 13. The PCRA court also stressed that, "[t]o demonstrate **Strickland** … prejudice, the PCRA petitioner 'must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case.'" PCO at 13 (quoting **Commonwealth v. Gibson**, 951 A.2d 1110, 1134 (Pa. 2008) (citation omitted)). "That assessment must necessarily include some measure of a finding that the witnesses were credible…." **Id.** (quoting **Commonwealth v. Johnson**, 966 A.2d 523, 540 (Pa. 2009)).

Despite focusing much of its legal discussion on the prejudice a petitioner must demonstrate to prove counsel's ineffectiveness for failing to call a witness, the PCRA court ultimately concluded that Attorney Stern had a reasonable basis for not calling Mary Boone. Specifically, the court reasoned that:

> 118. In deciding not to contact or interview Boone, trial counsel relied upon [Appellant's] report to him that Boone did not witness the altercation.

> 119. Because the threshold of reasonableness of his investigation decisions is viewed through the lens of what trial counsel knew and believed at the time, we conclude that trial counsel's decision to not contact or interview Boone as a potential witness was not entirely unreasonable, under the

- 25 -

circumstances, and therefore he did not provide ineffective assistance of counsel in regard to [the] investigation of Boone.

PCO at 16.

We disagree with the PCRA court that Attorney Stern acted reasonably. Even if Appellant told counsel that Boone had left the bar before the confrontation, we cannot accept that as a reasonable basis for counsel to not have at least **contacted** Boone, who was Appellant's fiancé, and who was present at Victor's Tavern at the time of the bar fight.

Nevertheless, we conclude that Appellant was not prejudiced by counsel's failure to investigate Boone or call her to the stand at trial.[4] The PCRA court expressly found that "Boone's testimony that she witnessed any part of the incident was not credible." PCO at 5. The record supports this credibility determination, as Appellant himself, and Joyce Smith, also testified at trial that Boone had exited the bar prior to the fight. Accordingly, because the PCRA court did not believe Boone's testimony that she saw the altercation, and the record supports that determination, we are constrained to conclude that Appellant has failed to prove that the absence of Boone's testimony caused him prejudice. **See Commonwealth v.**

_____

[4] We note that "this Court may affirm the decision of the PCRA [c]ourt if it is correct on any basis." **Commonwealth v. Hutchins**, 760 A.2d 50, 54 (Pa. Super. 2000) (citing **Commonwealth v. Pursell**, 749 A.2d 911, 917 (Pa. 2000); **Commonwealth v. Ahlborn**, 683 A.2d 632, 641 n.14 (Pa. Super. 1996)).

*Medina*, 92 A.3d 1210, 1214-15 (Pa. Super. 2014) ("The PCRA court's credibility determinations, when supported by the record, are binding on this Court.") (citation omitted).  Thus, Appellant's final ineffectiveness claim fails.

Order affirmed.  Petition for remand denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/11/2017